EXHIBIT A

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF INDIANA
# INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **1:21-CR-0130-JMS** |
| **TYRONE ROSS,** | ) | |
| **Defendant.** | ) | |

## Sentencing Memorandum

This sentencing memorandum is based upon interviews with Tyrone Ross as well as interviews with the following family members:

1. Michael Johnson, father
2. Marilyn Thompson, Maternal Grandmother

In addition, the following records were reviewed[1]:

A.     Medical and Mental Health Records

    1.  Marion County Jail Mental Health records

    2.  Indiana Department of Corrections Mental Health records

    3.  Eskenazi Health records

B.     Miscellaneous Records

    1.  Presentence Investigation Report filed March 28, 2022

    2.  Online Family Criminal Records

Tyrone Ross has faced overwhelming hurdles beginning at birth and has survived an extremely chaotic childhood, fraught with neglect, abuse, multiple moves, removal

---

[1] Records were requested from North Carolina Department of Social Services, Brooklyn Schools, Ewing Middle School, Palmetto Behavioral Health System, and the Union Evaluation Center, but were not received before the preparation of this memorandum.

from his parent's care, and multiple out of home care placements, all while Tyrone struggled with chronic mental health issues that have continued into adulthood. Tyrone's unrelenting traumas resulted in admissions to psychiatric hospitals and placements beginning in childhood.[2]   As documented in the Presentence Report[3], Tyrone was diagnosed in childhood/adolescence with attention deficit hyperactivity disorder (ADHD), antisocial [personality] disorder, bipolar disorder, depression, post-traumatic stress disorder (PTSD), obsessive compulsive disorder (OCD), and schizophrenia.  While in prison as an adult, Tyrone has been diagnosed with a multitude of mental health conditions including most recently, Schizoaffective Disorder[4].  As would be expected without ongoing treatment and supervision, Tyrone's behavior worsened over time.

Tyrone's mother, who failed to regain custody of Tyrone after his removal in early childhood, suffers from serious mental illness and is currently in custody in the Marion County Jail for Battery.  Both of Tyrone's parents have a long history of substance abuse and criminality which exposed Tyrone to neglect, instability, poor parenting, lack of appropriate bonding, substance abuse, wrongdoing, household instability, poor socioeconomic conditions, and deficient education.

As a consequence of Tyrone's neglectful parents, and abusive and neglectful guardians, Tyrone failed at school, has no vocational or employment skills, and has no positive role models or positive supports.

---

[2] Complex trauma outcomes refer to the range of clinical symptomatology that appears after such exposures.  Exposure to traumatic stress in early life is associated with enduring sequelae that not only incorporate, but also extend beyond Posttraumatic Stress Disorder (PTSD).  These sequelae span multiple domains of impairment and include: (a) self-regulatory, attachment, anxiety, and affective disorders in infancy and childhood; (b) addictions, aggression social helplessness and eating disorders; (c) dissociative, somatoform, cardiovascular, metabolic, and immunological disorders; (d) sexual disorders in adolescence and adulthood; and (e) revictimization.  Complex Trauma in Children and Adolescents, White Paper from the National Child Traumatic Stress Network, Complex Trauma Task Force,
http://www.nctsnet.org/nctsn_assets/pdfs/edu_materials/ComplexTrauma_All.pdf.
[3] Paragraph 71, page 15.
[4] Schizoaffective Disorder, a serious mental illness that is marked by a combination of schizophrenia symptoms, such as hallucinations and delusions, and mood disorder symptoms, such as depression or mania.

Tyrone is 30 years old, easily influenced, and has no vocational skills.  He is at high risk of disciplinary issues in custody due to his mental illness.  Tyrone requires intensive mental health and substance abuse counseling, rigorous vocational rehabilitation, and "real world guidance," for him to succeed in any way once he leaves custody.   He will require the support of his supervision officer to complete the necessary tasks to be successful on supervision.

**Family History**

Tyrone's parents are Trevetra Ross and Michael Johnson.   According to Tyrone, Trevetra is from Shelby, North Carolina, and she suffers from mental health difficulties. He believes his mother has been receiving social security disability since childhood. Trevetra is currently in jail in Indianapolis for a domestic assault on her boyfriend. Trevetra's mother, Marilyn Thomas, lives in North Carolina in a senior citizen community.

Father, Michael Anthony Johnson, is from Miami, Florida, where he currently lives.  Tyrone has never known his paternal grandparents. Mr. Johnson is the father of ten children and stated to the undersigned that Tyrone "cannot come to Miami."

Tyrone believes that his parents met during a drug transaction in North Carolina while his mother was buying drugs from his father.  Mr. Johnson confirmed this. Trevetra has a criminal history that includes prison sentences in Indiana for Battery (2013 and 2015) and in North Carolina for Assault with a Deadly Weapon (2008). Trevetra has also been charged with Battery Causing Serious Bodily Injury and Domestic Battery (2018) for which she is currently in jail pending charges after failing to appear. She also has prior arrests in Indiana for Disorderly Conduct (2013), Battery (2011) and Battery (2010).

Father, Michael Johnson, has a criminal history that includes Possession of Cocaine (1995-Florida), Petit Larceny, Theft (1987- Florida) Receiving Stolen Property (1992, North Carolina), Possession of Cocaine (2010-Florida), Drunk in Public (2013-

Florida), Tyrone believes his father's history includes robbing banks; however, the undersigned does not have a complete criminal history record.

Tyrone has four maternal half siblings:  Michael, the oldest, and Ashley, his older sister, have the same father:  Herbert Lucas.  Younger maternal half-siblings, Darren and Lanisha, were raised by their maternal grandmother, Marilyn.  Ashley lives in Indianapolis, Michael lives in Virginia, and Lanisha lives in North Carolina.

### Tyrone's Childhood

Tyrone was born in 1991 in Kings Mountain, North Carolina.  Tyrone believes he was born drug exposed to crack cocaine and he remembers being in foster care by age three because both his parents had drug problems.  Maternal Grandmother, Marilyn, confirmed that Tyrone was taken from his mother's care due to her drug abuse when Michael was about three years old.   Online North Carolina Prison records also indicate that Tyrone's father was in prison from 1994 to 1995 (when Tyrone was about two to three years old), after an arrest in 1992.  Maternal Grandmother, Marilyn, stated that Tyrone's parent did not have time for children and confirmed her daughter, Trevetra was on drugs; specifically crack cocaine.   Marilyn said Trevetra finally became sober two years ago, but she suspects has relapsed.   Marilyn recalled that she was worried about Trevetra as a mother.  Trevetra was always saying she needed things for Tyrone when he was little, and she wondered where the money (government assistance) was going.  She eventually learned Trevetra was using drugs.  Marilyn also confirmed that Trevetra has never worked.

Mr. Johnson said that he had met Trevetra in Kings Mountain, North Carolina while he was selling drugs.  Trevetra got involved in smoking crack and it "went downhill...it went south for both of us."   Mr. Johnson admitted that they both "got on drugs and doing dumb shit we shouldn't do."  Mr. Johnson said he eventually stopped, but Trevetra continued using.

Marilyn recalls when the state took custody of all Trevetra's children, a woman came down from New York and took Trevetra's older children first.  Eventually, they decided to also take Tyrone to New York even though he was not biologically related to his siblings' guardians.  Marilyn said that she was unable at the time to care for her grandchildren but did not clarify why.

Mr. Johnson said that Trevetra never tried to get Tyrone back and confirmed that he went to prison.  When Mr. Johnson was released from prison, Tyrone was in New York, and Mr. Johnson got married and moved to South Carolina.  Mr. Johnson admitted that he did not seek custody of Tyrone when he was released from prison.

Tyrone remembers being in foster care with his older siblings, Michael, and Ashley, in North Carolina, before he moved to Michael and Ashley's paternal grandmother's home in Brooklyn, New York.  Tyrone even recalls having his fourth birthday in New York.

As confirmed in the Presentence Report, Tyrone was removed from both of his parents' care and placed first in the home of his sister's father and grandmother, followed by foster care, group homes, residential treatment, and a brief stay with his father in his early adolescence.  Tyrone last saw his father at age 15.  It is unclear if Tyrone's parents' rights were ever terminated; however, by age 17, Tyrone was living on his own and homeless.

Tyrone spent ages four to 12 in Brooklyn, New York.  He lived with his sibling's father, Herbert Lucas (a convicted sex offender prior to Tyrone's placement[i]), and grandmother, Ossie Harris (now deceased).  Tyrone said that living with Ossie and Herbert "was kind of rough," and that he was told repeatedly that he was not their biological child/grandchild.  Tyrone was also both physically and sexually abused while in their care.  Tyrone remembers regular beatings with a broomstick, a paddle, an extension cord, even a PlayStation.  He said the beatings were bad enough he still has scars.

Tyrone's father, Michael, informed the undersigned that Tyrone was beaten, starved, and sexually abused while in the care of Herbert Lucas and Ossie Harris. Tyrone confirmed that he was sexually abused by Herbert Lucas and that his food was restricted, and his caregivers kept a lock on the fridge.  Maternal Grandmother, Marilyn, also confirmed that Tyrone's food was restricted while living with Ossie and stated that Ossie was not a good grandmother.  Marilyn also confirmed that all three children: Michael, Ashley, and Tyrone, were mentally and physically abused while living with Ossie, and that all three of them suffer from mental health difficulties and take mental health medications.

Tyrone does recall being seen for mental health needs while living in Brooklyn. He said he was put on medicine for attention deficit hyperactivity disorder (ADHD).  He was also put on Depakote, a medication used to treat seizures or certain psychiatric conditions.  He remembers going to counseling and described feeling very lonely and angry.  Tyrone continued to take medicine when he was placed in group homes back in North Carolina.

In later Indiana Department of Corrections (IDOC) records, it was noted that Tyrone has the following trauma history:

Trauma History
History of physical abuse: Guardians
History of emotional abuse: Guardians
History of sexual abuse: Molested at age 6 for about 2 years and didn't report it.
History of neglect: Removed from mom at 2 yo due to having a drug problem.
History of exposure to other traumatic events: Been robbed before, been jumped and hurt many times. Being an outsider in the state of Indiana and being in prison.

Tyrone's childhood medical history is unknown.  Tyrone said he was told he had a seizure at age one or two, but he did not know why.   Tyrone's maternal grandmother did not know Tyrone's medical or mental health history details.

Due to the neglect experienced by Tyrone in those first formative years with his mother, and the abuse suffered in New York with his guardians, Tyrone already had

burgeoning mental health problems which would make foster placement unsuccessful. Tyrone would eventually be hospitalized at Charleston State Hospital (now closed) after he attempted to harm himself.

Mr. Johnson recalled that all three children in New York started acting out, and Ossie began sending them back to Marilyn in North Carolina. Marilyn said that Tyrone was a "sweet child but so destructive" by then. While living with her, Marilyn did not have Tyrone on any medicine. Mr. Johnson said that Tyrone ended up back in foster care and Trevetra got a hold of him, letting him know where Tyrone was. Mr. Johnson said that Trevetra couldn't care for Tyrone because she was still using crack cocaine and had two more children removed from her care.

When Tyrone was placed in a group home, Mr. Johnson came to see him, and eventually took custody of him. Tyrone moved to South Carolina with his father, his stepmother, Caroline, and four children. Tyrone believes he only spent about six months with his father before his father relinquished Tyrone to foster care, and following that, Tyrone was sent for a psychiatric evaluation in Union, South Carolina. Mr. Johnson said that he could "not figure him [Tyrone] out." Mr. Johnson said that it was also not until that time that he received paperwork that showed Tyrone had been abused in New York. Mr. Johnson said that Tyrone did odd things, like take apart their doorbell, and that Tyrone needed more attention than he could give, as he had four girls to care for at the time, as well. Mr. Johnson explained that Tyrone quickly got into trouble in school for doing things that a second grader would do (like throw a pencil at the ceiling), not a seventh grader, which Tyrone was at the time. After Tyrone returned to North Carolina, Mr. Johnson said, "from there, I don't know what happened [to him]."

Maternal Grandmother, Marilyn, confirmed her recollection that Tyrone was placed in a facility in Union, as well as a residential treatment center in Florence, South Carolina, after he left his father's care.

As no school records were viewed, Tyrone's educational limitations, if any, are unknown. Tyrone recalls being placed in special education for his behavioral issues. He stated that the furthest he went in school was the 9th grade at a residential treatment center in Florence, South Carolina. But Tyrone stated that he has since completed his General Equivalency Diploma (G.E.D.) while at Clinton County Jail.

Tyrone has no memory of seeing his mother until age 13, when she visited him in foster care. He does not recall living with her as a toddler. After he went back into foster care from his father's care, he spent time in residential placements until age 17. He ended up at his brother, Michael's house before traveling to New York, North Carolina (and his grandmother's home), then arriving in Indianapolis to reunite with his mother. Tyrone believes that his mother moved to Indianapolis because she was in witness protection.

### Tyrone's Childhood Mental Health Issues

Records indicate that Tyrone's family has a history significant for mental illness and both his mother and sister are being treated at Midtown Mental Health. Tyrone's mother suffers from serious mental health and substance abuse issues. Tyrone suffers from severe, chronic mental health issues, which if not treated, will cause him difficulties within the Bureau of Prisons and when he is discharged to the community.

Tyrone believes he started receiving mental health counseling as a child in Brooklyn. He recalls being diagnosed with attention deficit hyperactivity disorder and posttraumatic stress disorder[5] and being prescribed Adderall and Depakote. Tyrone

---

[5] Long-term childhood maltreatment can lead to complex PTSD, a chronic form of PTSD with an additional constellation of symptoms. In complex PTSD, trauma survivors also commonly experience poor self-concept, depression, dissociation, and difficulty with affective regulation. They tend to be impulsive, aggressive toward themselves or others, and suffer from chronic feelings of shame and self-blame. They have low self-esteem and experience difficulty relating to other people (van der Kolk, 2002)...Clinically, individuals with complex PTSD appear anxious, hyperalert, and startle easily. They often report having difficulty sleeping and report disturbing nightmares. Long-term childhood maltreatment can result in recalibration of components of the body's stress response system. Because they are chronically physically

stated that he took medicine while in residential care during his adolescence; however, Maternal Grandmother, Marilyn, noted that during the brief periods that Tyrone lived with her she did not administer him any medication.

Tyrone was also admitted to psychiatric facilities, including Charleston State hospital for attempting to harm himself.  He was receiving social security disability (SSI) benefits until he became an adult.

### Tyrone's poor transition to adulthood

After Tyrone left placement at 17, he was homeless. He attempted to stay with relatives, ending up at his grandmother's home in North Carolina.  But Tyrone's grandmother said Tyrone could not stay with her. At the time she was caring for several other grandchildren, and she said that Tyrone's mental health was too much for her. After time spent in a homeless shelter in Gastonia, North Carolina, Tyrone got into contact with his mother, who now lived in Indianapolis, and used his social security check to take a Greyhound bus to his mother's residence on Meridian Street near 38th. Trevetra was not working and receiving a disability check for her mental health issues. But soon after he arrived in Indianapolis, his mother was arrested on what he thought was old charges (Trevetra has a 2008 North Carolina Assault with A Deadly Weapon case and a 2010 Marion County Indiana Battery case).

Tyrone was on his own after his mother's arrest and knew no one.  He said his mother told him to stay with "Sugar Ray" on the 7th floor, but Sugar Ray wouldn't let him in. He stayed in his mother's apartment for a few months until he was kicked out for non-payment.  So, in 2010, Tyrone was again on his own, this time on the streets of Indianapolis.  Tyrone stayed in Indianapolis because he had nowhere else to go and no money to leave.  Tyrone had continued to receive his social security check after he turned 18, but his checks stopped in March 2010.  Tyrone did not know he needed to be reevaluated as an adult to continue receiving assistance. Tyrone's mother would

_____

hyperaroused, many individuals with complex PTSD are constantly in survival mode.  *Biology, childhood trauma, and murder: Rethinking justice.*  K.M. Heide, E.P. Solomon, International Journal of Law and Psychiatry 29 (2006) 220-233.

continue to get arrested for violent offenses, being sent to prison in 2013 and 2015 for Battery.

Tyrone has no vocational skills and has had limited employment during adulthood.   During his times in prison, he has been kept in restricted housing and therefore has acquired no job skills.  Tyrone was released from prison in 2016 and did apply at a temporary employment service.  He recalls his most difficult job was one at the Henry Company, where he was required to do a lot of lifting.  He has never had an office job; but when asked what he would like to do after he is released, he stated that he would like to own his own event planning business.

Tyrone met the mother of his two children, Hailey, at McDonalds.  They became homeless together, sleeping in abandoned buildings.   They would have two children together:  Tyrone Jr, born in 2017, and Adrian, born in 2019.  Child protective services became involved before Adrian's birth and Tyrone did not have custody of either of his children before his arrest.

## Tyrone's limited health information

On November 5, 2012, IDOC records note that Tyrone had "seizure activity" while on basketball court.  He was noted as drowsy and slightly confused later upon nurse's assessment.  Tyrone mentioned he also suffered a seizure when he was little.  In July 2011, Tyrone suffered a mandible fracture while in prison.  No other health issues are known.

## Tyrone's Drug and Alcohol abuse history

Addiction is well known to be a chronic, relapsing disease.  Vulnerabilities to addiction are partly genetically based. However, early life adversity plays an important role.  Many people with otherwise untreated or under-medicated psychiatric illness, language or learning disabilities, exposure to violence, brain dysfunction or numerous medical conditions, self-medicate with illicit drugs, prescribed medication and/or

alcohol in an effort to control their emotional experience of the world[6]. Substance abuse is strongly associated with childhood abuse, neglect, and trauma. People who suffer abuse, neglect and/or trauma are significantly more likely to use drugs and alcohol[7].

Tyrone suffered significant childhood adversity along with exposure to addiction. Tyrone has regularly attempted to control his mental health disorders with alcohol and drugs. Tyrone also has a significant familial history of drug and alcohol abuse. His mother has a serious drug history that resulted in the removal of all her children (she also failed to reunify them) and Tyrone's grandmother believes she only became sober two years ago and has most likely since relapsed.

According to the Presentence Report, Tyrone began drinking alcohol at age 13, and admitted he was drinking heavily at the time of his arrest in August 2020. He also used marijuana beginning at age 13, cocaine at age 18, spice at 20, and methamphetamine at age 24. Hospital records indicated that Tyrone was seen at the Eskenazi hospital emergency room in 2010, after heroin and methamphetamine use in 2010, and admitted to Marion County Jail counselors that he has used methamphetamine daily for years. Without proper mental health treatment and medication, Tyrone will be at future risk of drug and alcohol abuse.

### Tyrone's Adult Mental Health Issues

Tyrone has entered adulthood with poor coping skills, impoverished social skills, and serious mental illness. He was sent to prison within the Indiana Department of Correction at age 20. According to the PSR, Tyrone was in the Indiana Department of Corrections from October 4, 2012, to February 27, 2015; from July 8, 2015, to November 016; and then from to May 4, 2021, to February 24, 2022. He has since been housed at Clinton County Jail. At the time of his release from Marion County Jail on February 24, 2022, Tyrone was on suicide observation based on Tyrone's self-expressed worry about his safety and "people out to get him," and the following risk factors:

---

[6] *A Practitioner's Guide to Defending Capital Clients who have Mental Disorders and Impairments, Chapter 8: An Overview of Clinical Disorders Common to Capital Clients*, The International Justice Project
[7] http://www.samhsa.gov/children/social_media_apr2011.asp

**Historical Risk Factors (static):**

Family/close friends history of suicide: No.

Prior suicidal/self-injurious behavior: Yes.

Prior suicidal/self-injurious ideation: Yes.

History of substance abuse: Yes.

History of physical or sexual abuse: Yes.

History of severe impulsivity: Yes.

History of mental illness/psychiatric treatment: Yes.

Cluster B personality traits: Yes.

According to Tyrone, he was housed within the IDOC first at the State Farm (Putnamville), then CIC, before he was transferred to the Maximum Control Unit at Westville Prison. He was then in the "CCU" at Wabash in Mental Health segregation, before being sent to the mental health complex at Pendleton.

Records indicate that:

- by May 12, 2011, Tyrone was placed in restrictive housing/behavioral health segregation, where it appears he stayed for most of his time in prison. Records indicate the Tyrone reported not getting his psychiatric medications (Risperdal) once he moved to segregation.
- By April 23, 2012, A Medication Management assessment determined that Tyrone had depression, and unspecified psychosis and his ability to manage the segregation environment "appears to be worsening."
- By January 2013, Tyrone was on suicide observation. On July 24, 2015, he was transferred to CHM restricted housing.
- A diagnosis of Antisocial Personality Disorder (ASPD) was made on June 11, 2013, along with a diagnosis of Recurrent Major Depressive Episodes, Severe, With Psychosis was made on July 15, 2015, and an additional diagnosis of Posttraumatic Stress Disorder (PTSD) was added on November 25, 2015.

12

- Tyrone was finally placed in mental health placement on November 30, 2015, (until his release in March 2016), after years of being placed in segregation, where he was diagnosed with <u>Schizoaffective disorder</u> (along with <u>PTSD, Depression, and ASPD</u>) and treated with antipsychotic medication.

Tyrone spent an extensive amount of time in segregation while in the Indiana Department of Corrections. Tyrone was unable to participate in any programming while in segregation and spent at least 23 hours a day locked in his cell.  Most of the time he had a brief check in <u>once</u> every month.  When Tyrone asked for more check-in's, records show he was denied.  Tyrone was finally transferred to a TC (therapeutic community) at the end of 2015 to early 2016, where he was provided some treatment.

Tyrone had a number of disciplinary actions that related to his mental health but did not lead to mental health placement/treatment. Instead, they were categorized as conduct violations, only.  Tyrone threatened/threw bodily fluids, screamed in his cell, flooded his cell, and had suicidal threats and actions.  For example, a violation that was identified as a conduct violation, occurred when Tyrone was attempting to hang himself and during his refusal to stop, swung at an officer:

| Name of offender | Offender's DOC number | Facility | Housing unit |
|---|---|---|---|
| Tyrone Ross | 218698 | CIF | 10C-1DS |

| Date and time of incident | | Place of incident | Date report written |
|---|---|---|---|
| 4-15-13 / 9:10  ☐ a.m. ☒ p.m. | | 10-1DS | 4-15-13 |

| Offense | Code number |
|---|---|
| assualt on staff | 117 |

DESCRIPTION OF INCIDENT (if more space is needed attach additional sheets in triplicate)

On 4-15-13 at 9:10 pm I officer Thomas Foster did respond to 10-1D.S. I was informed that offender Tyrone Ross # 218698 was attempting to harm himself. Offender Ross was standing on his bunk in the corner of the cell with white fabric wrapped around his neck. I ordered offender Ross to get down and he said "no". I deployed O.C. offender Ross then swung his left arm at me striking me on the right side of my face.

On another occasion in 2013, Tyrone was charged with disorderly conduct for cutting on himself:



Tyron's behavior led to Tyrone being placed in segregation, having his good time taken away, and being forcibly removed from his cell and sprayed with OC spray.

As noted in Indiana Protection and Advocacy Services Commission v. Commissioner, Indiana Department of Correction, Case No. 1:08-cv-01317-TWP-MJD, Southern District of Indiana.:

Based on the extensive evidence presented in this case the Court finds that there are three ways in which segregation is harmful to prisoners with serious mental illness.  The first is the lack of social interaction, such that the isolation itself creates problems.  The second is that the isolation involves significant sensory deprivation. The third is the enforced idleness, permitting no activities or distractions. These factors can exacerbate the prisoners' symptoms of serious mental illness. This condition is known as decompensation, an exacerbation or worsening of symptoms and illness.

Decompensation can be manifested by a prisoner experiencing auditory or visual hallucinations, sleep disturbance, memory problems, anxiety, paranoia, depression, eating problems, or engaging in self-injury or suicide. These symptoms can produce behavior which constitutes a threat to the safety of staff or to that of the prisoner himself.  It can also produce

And,

decompensation.  The deterioration and injury caused to mentally ill prisoners by segregation is documented by the IDOC in prisoner medical records, suicide and self-harm reports, and reports of use of force incidents.  As Dr. Walsh's report explains:

> The fact is that mentally ill people often have difficulty conforming to prison rules and regulations, and are more likely than other prisoners to be cited for disciplinary infractions.  In the isolation of these segregation units, there is a very high risk that mentally ill prisoners will decompensate and become more dysfunctional and harder to manage.

Records indicate that Tyrone requested mental health medication on many occasions but was repeatedly denied medications for several years.  This occurred even though Tyrone had a significant psychiatric history, including psychosis, well

documented in IDOC records (below) from as early as 2011 and with documentation that Tyrone had taken medication upon his transfer from county jail:

been treated in the past for psychiatric problem(s).  The patient was diagnosed with schizophrenia at age 13. Family history is positive for psychiatric problems, including mother with schizophrenia

**Progress Note**
**Direct Service:**          Individual
**Length of Service:**     20-30 min
**Therapeutic Interventions:**          Cognitive Behavioral, supportive,
**Comments:** Mr. Ross is a 19y/o coming to prison for the 1st time.  He is anxious to get out of my office today so he can go to gym.  He said he is taking meds for AH and VH; he said he has experienced since age 13 but could give no details he said he couldn't make out what saying or seeing.  He said he has the support of his stepfather but no one else.  He said his mother is schizophrenic and a crack head.  He said he has bros and sis's but none have mental illness.  He said he rec's SSI for bipolar, schizophrenia.  He said he quit school at age 17 because tired of it.  He said he was in special ed classes and everyone thought of him as retarded.  He seemed agitated but affect was mostly flat.


        Mental illness or emotional condition requiring suicide watch, the use of major tranquilizers or injectable psychotropic medications, requires frequent monitoring/surveillance by a psychiatrist.
xxx
___
H.

     A March 25, 2013, IDOC mental health note stated that Tyrone did not have a current psychiatric diagnosis that might worsen or interfere with his transfer to long term segregation, even though records stated that five days earlier, "Pt [Tyrone] threatening suicide, placing sheet around neck, making threats of hanging himself. Covering cell window with towel" and was on suicide watch after reporting back in February 2013 that he was thinking about killing himself and had plans to slit his wrist with a razor":

<u>Progress Note</u>
**Direct Service:**            Individual
**Individual(s) Present:**     Mr. Ross and Dr. Hurst
**Length of Service:**         20-30 min
**Comments:** Mr. Ross was seen face-to-face at cell-front, with his cuff-port dropped.  Given his recent behavior and the concern for safety, he was not allowed to leave his cell.  Per report, Mr. Ross has been sentenced to disciplinary segregation until 7/4/15 and is being considered for transfer to a long-term segregation unit.  A review of the chart revealed that Mr. Ross does not have a current psychiatric diagnosis, that might worsen or interfere with his transfer to long-term segregation.  He has not reported significant psychiatric symptom or taken psychiatric medication in over 90 days.  He denies current psychiatric symptoms, SI, HI, or thoughts of self-harm. He states that he is looking forward to his transfer, as he will have more privileges in long-term segregation.

Later IDOC records indicate that Tyrone was prescribed psychiatric medication, but not consistently, until 2015 when he was placed in CCU (Westville, placed July 10, 2015) after being on suicide observation since October 14, 2014, for thoughts of self-harm[8].  Records indicate that Tyrone had three suicide attempts while incarcerated at Westville, including in 2014 by hanging, but notes by staff showed little concern for Tyrone, who begged for help as documented in 2014:

---

[8] Tyrone's current mental status was noted as disheveled, loud speech, anxious mood, poor reasoning, poor impulse control, poor judgement, poor insight, thought process shows flight of ideas, and thought content reveals paranoia.  He was also noted to rock back and forth in his chair, laugh at inappropriate times, and that during the conversation he was observed responding to internal stimuli.  It was also reported that he had bitten on several batteries/having strange behavior.

**DEPARTMENT OF CORRECTIONS**
**ADMINISTRATIVE NOTE**

**SITE:  WCU**
**COMPLETED BY:  Nicholas P. Wardell, MHP**  09/09/2014 7:42 AM

**NAME:  ROSS, TYRONE**
**IDOC #:  218698**
**DOB:    07/20/1991**

**Tracking Information**
Date of occurrence 09/07/2014

**Type of request**
Patient inquiry

**Issue**
HCRF 17251: "Read Attachment" :  "MHP Wardell Im here to inform you, that I feel and believe that the only reason you say "you have not seen any reason I should be on medication," is because you feel I am being untrue about my disorder which would get me my medication, and perhaps and Mental Health transfer, which is alot of paperwork for you.  But I am not telling you nor lieing about me seeing and hearing things, I have and still am telling you that the flashbacks, dreams, and memories that Im having is affecting me mentally, which leaves me with suicidal thoughts.  All flashbacks dreams and memories are negative images an thing Ive done to people and its associated with depression, stress, and anxiety.  All medication I've been on before, is all for depression, stress and anxiety, so for the last 1 1/2 months I've been addressing this issue to you and I am not receiving any treatment nor counseling that's helping me with these problems.  So as of today everything has been put in my attorneys hands.  Tyrone Ross 218698."

**Additonal comments**
response:  "Your letter has been documented.  You'll be seen for counseling again by 9/26/14."

Tyrone continued to be placed in segregation for behaviors such as: "[Tyrone] reported that he was on a hunger strike out of concern that this other offender is not "paying guards to poison my food."  Tyrone's mental health would continue to deteriorate in long term segregation, and he was again placed on Temporary Mental Health Placement (also segregation) on November 23, 2015, after lighting his mattress on fire:

**Suicide Observation**
**Daily visit**

**Date placed**           10/14/2014
**Time placed**           10:00 am
**Subjective**
**Reason for placement:** Ross was placed on TMHP on 11/23/15 after he was found to have lit something on fire
in is cell, presented as labile in mood, and was making psychotic statements such as hearing voices telling him to
light his mattress on fire.

When seen today, Ross presented as calm and stable, though he spoke with pressured speech and stutter at
times.  He denied auditory hallucinations today, but stated that he hears them "sometimes."  He explained that he
hears "God and the devil, but they sound the same so I never know who I'm listening to."  He continues to deny
depression symptoms, and denied SI/HI as well.  Writer reviewed recent events with Ross, such as attending his
first Moral Reconation Therapy group last week and getting into an altercation with another offender who
apparently Ross had several altercations with, which prompted Ross's removal from group.  Ross acknowledged
that much of his recent behavior has been "all the result from that" and explained that he feels as if he is unsafe,
which prompts paranoia and hypervigilance on his part, as he now is concerned about many things such as
custody poisoning his food and being "set up" to get murdered.  He related that he has had several near death
experiences, and that his response to the MRT incident for example "is what any normal person would do if they
thought they could get killed."  Writer discussed with Ross coping skills to use to help regulate his reactions in
future situations, as he expressed concern with how long he has been "on high alert" since then and difficulty
controlling himself during those times.  While he was agreeable to practice these skills, he could not agree that he
will not "retaliate" if he feels someone threatens his safety.  When asked what that meant, he discussed various
situations that may occur in prison, such as an officer being rude to him, and that this might send him into "I don't
give a fuck mode."  Writer maintained TMHP orders to maintain his safety and to monitor his behavior, as
tomorrow is a holiday, and MH staff will not be in until Friday to re-assess him.  Additionally, writer will refer him to
psychiatry to address

Tyrone was finally considered "Seriously Mentally Ill", and therefore not suitable
for continued placement in restricted housing in late 2015:

Writer reviewed this offender with Dr. Huffey, and it was decided that Major Depression with Psychotic Features
and Post Traumatic Stress Disorder is an appropriate diagnostic description of Ross' symptoms.  Additionally, he
meets Seriously Mentally Ill criteria due to functional impairment, as he was recently removed from a therapy
group due to attempting to assault another offender, has engaged in dangerous behavior such as lighting fire in
his cell, reports fairly serious mental health symptoms such as hearing voices and severe impairment in terms of
anxiety and PTSD symptoms (see note from 11/24/15), was briefly on a hunger strike due to fear his food was
being poisoned, and is involved in frequent altercations with custody staff where he becomes agitated and appears
psychotic.

**Orders/Plan**
He will be staffed on regional movement call to determine whether he requires a treatment unit or
alternate housing outside of restricted housing.

**Orders/Plan**

**Medications**

| Medication Name | Sig Desc | Stop Date |
|---|---|---|
| Zoloft 100 mg tablet | Take three tablets by mouth in the morning | 04/05/2016 |

It was then determined that Tyrone may be prodromal (early stages) schizophrenia and it was decided that Tyrone was "not appropriate for ongoing housing in CCU, and so will likely be transferred to a mental health unit"  This determination was made because Tyrone met criteria for a SMI (Serious Mental Illness), his symptoms were finally considered "clinically severe,"  and "his functioning in the restricted housing unit is severely impaired without this [daily] kind of support."  A medication management evaluation at CCU noted the following:

---

**1. BH - Medication Management**
Pt seen in CCU out of cell.  He reports that he wants off the zoloft as this medication causes him diarrheal.  He reports that he has probs with anxiety, and that he becomes focused and worried about things, then talked about someone paying a CO to mess with his food, so he is always paranoid about his food, but does better if he can watch them with his food.  States he also gets depressed and down in the dumps not wanting to do anything, and that he worries more when he gets depressed.
Dr Mannarino also reports some probs with tangential thought processing and some bizarre thoughts.
Pt reports he was in trouble a lot when he was young and was in multiple placements including one that was a psych placement.  Sounds as if he was in a Residential facility in NC for 18 mos ( age 15-17)  Said he got in trouble for stealing.  Talked about his theft and whether it was associated with drug use and he denied.  Stated he was obsessed with YUGIO cards and that was what he bought with the money he stole.
Now serving time for Bank Robbery, which he did because he didn't have any money.  He is on probation violation.  Just he gave up and stopped going to his probation meetings.  He is concrete in his thinking.  He releases 3-17-16, and will go to shelter.  His M is in prison in RTC for stabbing someone.  She has a hx of Cocaine use and paranoid schizophrenia.  May have actually tried to stab this offender also.
Has been on celexa, remeron, geodon in past.  Has had probs with his stomach with antidepressants.  Suggested restart geodon.  He was agreeable, stated this had worked the best.  He reviewed the side effects but was not able to sign consent as he was in shakedown cage.  He gave verbal consent.
With his MSE and concrete thought processing and paranoia, he may be prodromal schizophrenia, will need to consider this further.  He will be moving to NCP in future to receive more tx and transition out of RHU

---

Tyrone was prescribed the following medications while in IDOC:  Celexa (an antidepressant), Geodon, (an antipsychotic medication), Zoloft, (an antidepressant), Risperidone, (an antipsychotic), Benztropine, (a medication to treat the side effects of antipsychotic medication), and Remeron (an antidepressant).  When seen for medication management in February 2016, it was noted Tyrone was not taking his Geodon consistently due to side effects.  It was also noted that Tyrone was "exhibiting signs of psychosis." A psychiatric evaluation further diagnosed Tyrone with Schizoaffective disorder and detailed:

**History of Present Illness**
This 24 year old male presents with:

**1.  BH - Initial Psychiatric Evaluation**
 The symptoms are reported as being moderate. He states the symptoms are fairly controlled. 24 yo male seen for psych eval. He arrived last Tues at IRT, and was at CCU x 6 mos., and was at home prior to this. He is here on a Probation Violation out of Marion Co. w/sent. of 9 mos. and EPRD is 3/17/16. Says no place to stay. States he was homeless in Indpls. Since he's not received SSI x 2010, and reports he'd been on this most of his life. No hx. of employment. Says Mo lives in Indy also but is at Rockville now and doesn't get released until 4/2017.  Med Probs.: Lymph node, submandibular on Left side x 3 mos. 3 "cracks in Left Mandible d/t being hit from behind. NKDA Meds.: Geodon 40 mg. hs  Surg.: None  Educ.: HS and states he did well, and was in Alternative School for behavioral probs. Tob.: None  EtOH:QD, ~ 5th+ liquor  FamHx.: None  Drugs: MJ, QD but not sure of amt. Denies others or IV use.  Psych Tx.: Midtown through Eskenazi Health in May '15 and was schedule for a Dr.'s appt. in June but was locked up before being seen. Reports sxs. were "bad anxiety, depression." Says if he's around a lot of people, states "I can feel the energy of angry people that are ghosts." States he feels the only one that can save him is him b/c he's not involved in a religion. States he knows he has psych issues, which is the reason he agreed to come to IRT. Reports he was an InPt in Florence, SC x 18 mos. Says he was on a lot of meds, incl. Depakote, Trazodone, Adderall. Says he tried to kill self in Orangeburg, SC and was sent to Charleston, SC State Hosp. for intake and was released; says he was about 13 yo. Says no other InPt Tx.  States he first began psych tx. in NY at around age 4 or 5 yo and was approved for SSI and was on several meds. Reports he had periodic OutPt Tx. in Brooklyn, NY. States he's been in DOC in IN for last 6 yrs. Says he was first on Risperdal d/t SE and wasn't effective. Also took Cogentin for SE. Has also taken Celexa, Zoloft, Remeron. Has only been on Geodon x ~ 1 mo. Says he's been recently refusing d/t difficulty urinating. Says since off Geodon, says he's not been feeling right. Says the demons he noted above are "fighting to possess me", and he has to deal w/these on his own. He has talked to mentor about this. No SI/HI but reports AH at times which is whispering usually. Says he likes the voices b/c he thinks the whispering could be a different species from another planet trying to communicate w/him. Reports mood is "off and on", has trouble "staying cool" or staying humble. Also notes mood is based upon vibe he gets off other people. States he wants a "cure" and doesn't wish to try alternate medication for his sxs. Will see in 30 days.  Is ambivalent re: continuing Geodon; says it helps but has trouble urinating and doesn't understand that Cogentin will likely aggravate this. Have reordered med. He refused to sign Consent.

**Chronic Problems**
Axis    Description
           Posttraumatic stress disorder
Axis I  Schizoaffective Disorder
Axis II Antisocial personality disorder

When Tyrone was arrested in 2021, Marion County Jail completed a mental health assessment which determined Tyrone suffered from chronic mental health conditions of Major Depressive Disorder, Recurrent, With Psychotic Symptoms, and an anxiety disorder.  Marion County Jail prescribed Buspirone (anti-anxiety) 10 mg. and Remeron (anti-depressant) 15 mg.  Tyrone was also provided Anger, Anxiety and PTSD handouts by mental health jail staff.  During follow up wellness checks, jail mental health staff noted that "...Ross stated that his medications are helping very much.  Ross was polite and engaged with Writer during today's visit."   But again, when Tyrone was sent to the Indiana DOC in 2021, as recent as June 22, 2021, days before his transfer out of the Indiana Department of Corrections to USM custody, Tyrone was again in suicide observation and in restrictive housing.  Tyrone was also not diagnosed with a psychotic

disorder, even with his extensive history of psychosis in IDOC, and considering that psychotic disorders, such as schizophrenia and schizoaffective disorders, do not cure themselves. Tyrone is not taking any medication at Clinton County Jail.  Tyrone stated that he cannot afford them.

Deterrence for the mentally ill requires much more than simple incarceration. And in fact, incarceration of the mentally ill can increase the risk of re-offense.  When individuals are not given adequate mental health care and are instead locked in segregation, their mental illness increases, and they learn no skills to better cope in the world.  They become even more fearful and paranoid. It appears that was the case during Tyrone's previous incarcerations.

Tyrone's conduct during the instant offense, discharging a firearm during a protest of the in-custody death of George Floyd, is an offense that could have led to lethal consequences and as such, should be handled seriously.  As Tyrone will be released in the not-so-distant future, it is in the Court and society's best interest to provide him the mental health care that he so desperately needs after a life of trauma and serious mental illness.  In addition, being provided vocational skills, will improve Tyrone's ability to be successful after release.

Without intensive mental health treatment, treatment that is not limited to segregation and isolation, it would be expected that Tyrone will have a poor transition to the Bureau of Prisons.   Programs[9], such as the BRAVE (Bureau Rehabilitation and Values Enhancement Program) program, the Challenge Program, or the Mental Health Step Down Unit Program, should be considered for Tyrone's initial transition to the Bureau of Prison.  Residential Drug Treatment should be considered before Tyrone's release.  Tyrone would also benefit tremendously from participating in occupational training programs within the BOP, as without a trade/occupation, he will be unable to provide for himself, or his children.

---

[9] Directory of National
https://www.bop.gov/inmates/custody_and_care/docs/20170518_BOPNationalProgramCatalog.pdf Programs (bop.gov)

In addition, Tyrone would benefit from transitional living services, vocational rehabilitation, assistance with obtaining benefits, and assistance in accessing mental health services upon his release.  It would not be expected that Tyrone could access these necessary resources independently without assistance, as he has been unable to do so in the past and he has no family support to do so.


Respectfully submitted,


/S/Jacqueline Guy
Jacqueline Guy



Jacqueline Guy, LCSW
Indiana Federal Community Defenders
111 Monument Circle, Ste. 2150
Indianapolis, IN 46204
T: (317) 383-3520
F: (317) 383-3525
Jacqueline_Guy@fd.org

**HERBERT LUCAS**
**Offender ID:** 0250459
**Inmate Status:** INACTIVE
**Probation/Parole/Post Release Status:** INACTIVE
**Gender:** MALE
**Race:** BLACK/AFRICAN AMERICAN
**Ethnic Group:** AFRICAN
**Birth Date:** 06/03/1959
**Age:** 62

### Name(s) Of Record

| Last Name | Suffix | First Name | Middle Name | Name Type |
|-----------|--------|-----------|-------------|-----------|
| LUCAS | | HERBERT | | COMMITTED |
| LUCAS | JR | HERBERT | | COMMITTED |

### Most Recent Incarceration Summary

| | |
|---|---|
| **Incarceration Status:** INACTIVE | **Total Incarceration Term:** 10 MONTHS |
| **Conviction Date:** 01/11/2001 | **Projected Release Date:** 08/27/2001 |
| **Primary Crime:** MISD B&E (PRINCIPAL) | **Primary Crime Type:** |
| **Special Characteristics:** REGULAR | **Current Status:** N/A |
| **Admission Date:** 01/12/2001 | **Admission Facility:** CRAVEN CI |
| **Control Status:** REGULAR POPULATION | **Next Control Review:** UNKNOWN |
| **Custody Classification:** MINIMUM 1 | **Next Custody Review:** UNKNOWN |
| **Current Location:** NEW YORK | **Previous Location:** ROBESON CC |
| **Last Movement :** EXPIRATION | **Last Movement Date:** 08/27/2001 |

Escapes?: N

### Offender Sentence History

#### Most Recent Period of Incarceration Record

| | |
|---|---|
| **Sentence Number:** BA-001 | **Commitment Type:** INMATE |
| **Conviction Date:** 01/11/2001 | **County Of Conviction:** FRANKLIN |
| **Service Status:** EXPIRED | **Sentence Begin Date:** 01/11/2001 |

### Offender Sentence History

**Actual Release Date:** 08/27/2001
**Punishment Type:** ACTIVE SS   **Projected Release Date:** 08/27/2001
**Sentence Type 1:** DEPT OF CORR DIV OF PRISONS
**Minimum Term:** 8 MONTHS   **Maximum Term:** 10 MONTHS

| Commitment | Docket# | Offense (Qualifier) | Offense Date | Type | Sentencing Penalty Class Code |
|-----------|---------|--------------------|-------------|------|------------------------------|
| INITIAL | 00051966 | FELONY B&E (PRINCIPAL) | 12/29/2000 | FELON | CLASS H |

#### Previous Period of Incarceration Record

| | |
|---|---|
| **Sentence Number:** AA-001 | **Commitment Type:** INMATE |
| **Conviction Date:** 05/03/1990 | **County Of Conviction:** CLEVELAND |
| **Service Status:** EXPIRED | **Sentence Begin Date:** 11/08/1990 |
| | **Actual Release Date:** 02/16/1994 |
| **Punishment Type:** FAIR FELONS | **Projected Release Date:** 04/24/1994 |
| **Sentence Type 1:** DEPT OF CORR DIV OF PRISONS | |
| **Sentence Type 2:** PROBATION REVOCATION | |
| **Sentence Type 3:** REGULAR PAROLE | |
| **Minimum Term:** | **Maximum Term:** 10 YEARS |

| Commitment | Docket# | Offense (Qualifier) | Offense Date | Type | Sentencing Penalty Class Code |
|-----------|---------|--------------------|-------------|------|------------------------------|
| INITIAL | 89008368 | RAPE SECOND DEGREE (ATTEMPTED) | 09/09/1989 | FELON | CLASS H |

#### Most Recent Period of Supervision Record

| | |
|---|---|
| **Sentence Number:** 01-001 | **Commitment Type:** PROBATION/PAROLE |
| **Conviction Date:** 05/03/1990 | **County Of Conviction:** CLEVELAND |
| **Punishment Type:** PRE-SS (FAIR) DCC | |
| **Sentence Type 1:** PROBATION | |
| **Sentence Type 2:** SUSPENDED SENTENCE | |
| **Sentence Type 3:** DEPT OF CORR DIV OF PRISONS | |

| Commitment | Docket# | Offense (Qualifier) | Offense Date | Type | Sentencing Penalty Class Code |
|-----------|---------|--------------------|-------------|------|------------------------------|
| INITIAL | 89008368 | RAPE SECOND DEGREE (ATTEMPTED) | 09/09/1989 | FELON | CLASS H |